# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————————

No. 07-1877

—————————

| | |
|---|---|
| Darius Ramanauskas, | * |
| | * |
| Petitioner - Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota |
| United States of America, et al., | * |
| | * |
| Respondents - Appellees. | * |

—————————

Submitted:  January 15, 2008
Filed:  June 2, 2008

—————————

Before LOKEN, Chief Judge, MURPHY, Circuit Judge, and JARVEY,* District Judge.

—————————

LOKEN, Chief Judge.

Effective March 31, 2003, the United States and Lithuania entered into the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, Oct. 23, 2001, S. Treaty Doc. No. 107-4 (the "Treaty").  In October 2004, the United States, acting on behalf of Lithuania, filed a complaint in the United States District Court for the District of Minnesota seeking the extradition of Darius Ramanauskas to face Lithuanian criminal charges.

———————————————

*The HONORABLE JOHN A. JARVEY, United States District Judge for the Southern District of Iowa, sitting by designation.

After a hearing, the district court rejected various defenses asserted by Ramanauskas and issued an Amended Certification of Extraditability. <u>See</u> 18 U.S.C. § 3184. Because there is no direct appeal from an extradition certification, <u>Matter of Assarsson</u>, 687 F.2d 1157, 1159 (8th Cir. 1982), Ramanauskas filed a petition for a writ of habeas corpus, asserting that his extradition is barred by Article 5 of the Treaty, a double jeopardy provision (known internationally as a *non bis in idem* clause) that has ancient roots and is commonly included in modern extradition treaties. <u>See generally</u> <u>Sindona v. Grant</u>, 619 F.2d 167, 177-78 (2d Cir. 1980). The district court[2] denied the writ. Ramanauskas appeals. Construing the provisions of the Treaty *de novo*, we affirm.

In 2002 and 2003, United States and Lithuanian law enforcement agencies investigated a group of Lithuanian citizens smuggling counterfeit U.S. currency and the controlled substance "Ecstacy" into the United States. In the District of Minnesota, Ramanauskas pleaded guilty to two counts of counterfeiting (passing counterfeit $100 bills) in May 2003. He served an eight-month prison sentence. Meanwhile, Lithuanian authorities filed drug and counterfeiting criminal charges and submitted a request to the U.S. Department of State that he be extradited.

Before Ramanauskas could be deported or extradited, he and two others were indicted in the District of Minnesota for conspiring to deal in, and passing, counterfeit U.S. currency that they received from Lithuania during the time period described in the pending Lithuanian charges. The indictment contained no reference to the smuggling of Ecstacy or other drug trafficking. Ramanauskas pleaded guilty to the conspiracy offense and one substantive counterfeiting offense. The lengthy written plea agreement included the following provision:

---

[2] The HONORABLE MICHAEL J. DAVIS, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the HONORABLE JEANNE J. GRAHAM, United States Magistrate Judge for the District of Minnesota.

The United States Attorney's Office for the District of Minnesota agrees to not bring any additional charges against [Ramanauskas] based upon information known to it . . . as of March 19, 2004 -- to wit: . . . [his] participation in the distribution of Ecstacy. This commitment . . . does not apply to any other agency or department of the United States, or to any other proceeding such as deportation, extradition, or the like. Upon acceptance of the plea and the plea agreement, the United States will move to dismiss any remaining charges . . . .

Following acceptance of Ramanauskas's guilty plea, the probation office prepared a presentence investigation report that described his receipt of both counterfeit currency and Ecstacy from conspirators in Lithuania. Ramanauskas objected and requested the deletion of all references to drug activities "in order to preserve his rights . . . in Lithuania." The government's sentencing memorandum responded that "the United States did not pursue the Ecstasy charges because of a request from the Lithuanian government." The district court sustained the objection, deleted all references to uncharged drug conduct from the PSR, and sentenced Ramanauskas to eighteen months in prison for the counterfeiting offenses.

Less than one month before Ramanauskas was sentenced for the counterfeiting offenses, the United States filed its extradition complaint on behalf of Lithuania. Consistent with the Lithuanian charging documents, the complaint initially included both drug and counterfeiting offenses. However, after judgment was entered on Ramanauskas's second counterfeiting conviction, the United States moved to dismiss the complaint insofar as it sought extradition for the Lithuanian counterfeiting charges, explaining that those offenses now fell within the Article 5 of the Treaty, which is entitled "Prior Prosecution" and provides:

1. Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested. Conviction or acquittal also means,

-3-

under Lithuanian law, an agreed resolution approved by a court with final and binding effect.

2.   Extradition shall not be precluded by the fact that the competent authorities of the Requested State have decided either:

(a) not to prosecute the person sought for the acts for which extradition is requested;

(b) to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or,

(c) to investigate the person sought for the same acts.

Ramanauskas argues on appeal, as he did to the district court, that Article 5.1 of the Treaty bars his extradition for the Lithuanian Ecstacy charges.  Habeas review of an extradition order is limited, but it includes the determination of whether the crime for which the requesting country seeks extradition "fell within terms of the treaty."  Assarsson, 687 F.2d at 1159.  The purpose of extradition treaties is "the surrender of fugitives to be tried for their alleged offenses."  United States v. Wiebe, 733 F.2d 549, 554 (8th Cir. 1984).  "[I]f a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."  Factor v. Laubenheimer, 290 U.S. 276, 293-94 (1933).

Relying on a portion of the second sentence in Article 5.1, Ramanauskas contends that, when the Minnesota United States Attorney agreed "to not bring any additional charges" in a plea agreement that was then approved by the district court, the plea agreement became an "agreed resolution approved by a court with final and binding effect."  Therefore, though drug offenses were never charged in the United States, drug offenses equivalent to the alleged Lithuanian drug offenses were "resolved" by a court in the United States (which in this case is the "Requested State"

for purposes of Article 5), and so the Lithuanian drug offenses are expressly excluded from extradition by the second sentence of Article 5.1, just as offenses for which "convictions" and "acquittals" have been obtained in the Requested State are expressly excluded from extradition by the first sentence of Article 5.1. Like the district court, we disagree.

The contention is fatally flawed because it ignores the previous words in the second sentence, "under Lithuanian law." In our view, the plain import of these limiting words is that the second sentence was inserted because, under Lithuania's legal system, the words "convicted or acquitted" in the first sentence of Article 5.1 might not include dispositions of Lithuanian criminal proceedings to which the double jeopardy protection should apply. In other words, the second sentence only applies when Lithuania, rather than the United States, is the "Requested State." The Treaty's legislative history in the United States confirms this interpretation. In urging ratification, the Report of the Senate Committee on Foreign Relations explained:

ARTICLE 5(1) -- PRIOR PROSECUTION

The Lithuanian delegation expressed concern that the terms "convicted or acquitted" used in the first sentence are not broad enough to cover all matters under Lithuanian law. Therefore, the following sentence was added to provide a broader definition: "Conviction or acquittal also means, under Lithuanian law, an agreed resolution approved by a court with final and binding effect."

S. EXEC. REP. NO. 107-13, at 5 (2002).

This interpretation of Article 5.1 is reinforced by the plain meaning of Article 5.2, which provides in relevant part that "[e]xtradition shall not be precluded by the fact that the competent authorities of the Requested State have decided . . . not to prosecute the person sought for the acts for which extradition is requested . . . ." Here,

-5-

as the district court concluded, the Minnesota United States Attorney's commitment in the plea agreement not to bring additional charges was a decision "not to prosecute" known but uncharged drug offenses for which Lithuania was seeking extradition. The plea agreement expressly stated that it did not apply "to any other proceeding such as . . . extradition," and Ramanauskas later asked the district court to remove any references to drug activity from the PSR "to preserve his rights, whatever those may be in Lithuania." Ramanauskas offers no support, textual or otherwise, for his assertion that Article 5.2 only applies when the Requested State's authorities make a "unilateral" decision not to prosecute, without court approval.

Ramanauskas complains that, under the government's interpretation of Article 5.2, Lithuania may now prosecute him for the additional counterfeiting charges the United States dismissed pursuant to the plea agreement. This contention confuses distinct Treaty provisions. The government dropped all Lithuanian counterfeiting charges from the extradition complaint. If he is extradited, Lithuania has agreed in Article 16.1(a) of the Treaty (titled the "Rule of Speciality") to prosecute him *only* for offenses "for which extradition was granted." On the other hand, had the United States not dropped the Lithuanian counterfeiting charges from the extradition complaint, the district court would have needed to decide before issuing a certificate of extradition whether those specific charges were barred by Article 5 of the Treaty. Compare Elcock v. United States, 80 F. Supp. 2d 70 (E.D.N.Y. 2000); Matter of Montiel Garcia, 802 F. Supp. 773 (E.D.N.Y. 1992), aff'd, 987 F.2d 153 (2d Cir.), cert. denied, 509 U.S. 930 (1993).

The judgment of the district court is affirmed.

_____